[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE MOTION TO OPEN JUDGMENT #115 AND MOTION TORESTRAIN THE TRANSFER OF ASSETS #116
On September 26, 1995, the parties' marriage was dissolved. A limited contested hearing had been held on March 15, 1995 before Ottaviano, J. The defendant was not physically present at the time of the trial. Her counsel was present and participated in the hearing. The hearing was closed on March 15, 1995 with the exception of one provision allowing the plaintiff to provide certain information on his father's estate, which was done at a brief hearing on May 31, 1995. Defendant was not physically present at that time, either. CT Page 12784-A
On October 16, 1995, the defendant filed a Motion to Open Judgment (#115), with four grounds stated, and, at the same time, a Motion to Restrain the Transfer of Assets (#116). At the time of the hearing on these motions, the fourth ground asserted in the Motion to Open Judgment was orally withdrawn on the record. The three remaining claims asserted by the defendant in seeking to open the judgment of September 26, 1995 are:
 1. The defendant claims that the plaintiff committed fraud by stating the value of Neurogen stock was $170,300, which defendant claims was in fact valued at $235,800 at the time of the trial;
 2. The defendant claims that the plaintiff committed fraud by not updating his financial affidavit within 30 days of the decree, which defendant claims would have shown the Neurogen stock value as $627,375.
 3. The defendant claims that the plaintiff fraudulently misrepresented the number of shares of stock he owned as 26,500, claiming that he should have included the 5,760 shares he transferred to his two sons, which transfer the defendant claims was also fraudulent. CT Page 12784-B
In order to prevail on a claim of fraud, the defendant must prove the elements by clear and convincing evidence. "The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment. (citations omitted)."Billington v. Billington, 220 Conn. 212, 217 (1991).
In family matters, the court must also find that," [t]here must have been no laches or unreasonable delay by the injured party after the fraud was discovered", "[t]here must be clear proof of the perjury or fraud" and "[t]here must be a substantial likelihood that the result of the new trial will be different."Ibid. at 218, Varley v. Varley, 180 Conn. 1, 4, 428 A.2d 317
(1980).
A hearing was held on the defendant's motions on October 30, 1995. The court makes the following findings of fact.
At the trial of the dissolution of marriage of the parties, the plaintiff submitted a sworn financial affidavit, dated March 15, 1995. In that affidavit, the defendant swore under oath that he owned 26,200 shares of Neurogen stock; he valued it at $6.50 CT Page 12784-C per share, or $170,300 total. He testified that he thought it was worth something more than that figure, and, that it was his bad luck that the stock value had increased at the time of trial. The trial court had personal knowledge of the actual value of a share of Neurogen stock on March 15, 1995 (the date of trial) as reported on the NASDAQ exchange. In addition, this court takes judicial notice that this information is available to the general public on a daily basis, as reported in daily newspapers throughout the country and, specifically, in this region of Connecticut.
In January of 1992 and January of 1993, the plaintiff transferred shares of Neurogen stock to himself as custodian for each of his two sons, Alexander and Nathaniel, under the Uniform Gift to Minors Act. Alexander's UGMA account had 2,890 shares and Nathaniel's account had 2,870 shares, purportedly gifted to them by plaintiff. In pretrial disclosure, the plaintiff had, in the Summer of 1994, disclosed these gifts as outright transfers (without relating their UGMA status) to each of his two children, devoid of any custodial reference. In the same formal disclosure the plaintiff answered the following inquiry: "Are you holding any property or asset for the benefit of another person in trust or otherwise?", "No".
The plaintiff's financial affidavit did not reflect that he CT Page 12784-D had any legal or equitable interest in the Neurogen stock held in the UGMA accounts. He provided no evidence or testimony to the trial court for which the trial court or the defendant could have inferred that he had any interest in the stocks held in these accounts.
At trial, plaintiff disclosed the following liabilities on his sworn financial affidavit: Smith, Barney, Shearson $18,655.04, Mastercard $200.00, Federal Income Tax (1994) (e) $6,500.00, and Rutkin and Rutkin undetermined. He totalled these as $25,355.04 of debt, not including his debt of attorney's fees (Rutkin). He also testified before the trial court that he, personally, was paying Alexander's college education, or at least the balance after Yale's Tuition benefit, and other expenses related to Alexander. This was disclosed as a monthly cash flow expense of $1,941, not as a debt. In plaintiff's trial claims for relief he asked the trial court to order:
 "11. The Plaintiff shall be responsible for paying the college education and related expenses of the children of the parties, . . .
 12. Each party shall pay his or her own liabilities, as shown on their respective financial affidavits. CT Page 12784-E
 13. Each party shall pay his or her own attorney's fees."
These proposed orders were confirmed by the plaintiff as his position at trial. At trial he confirmed that he was paying "all of the college education and related expenses for both of [his] sons, and, that he would pay his own liabilities as shown on [his] affidavit."
The $18,655.04 liability to Smith Barney was incurred to pay at least $8,000.00 in attorney's fees and to cover the plaintiff's short fall in cash flow resulting from his monthly expenses exceeding his monthly income. The plaintiff planned to sell some of the 26,500 shares of Neurogen stock in his name solely to pay the liability. As he said at trial, ". . . I mean I am going to have to sell some [stock] to pay off this debt to Smith Barney Shearson Lehman, because the insurance [sic] on that is ferocious. So yes I am going to sell some to zero out that debt."
On June 20, 1995, after the trial and prior to the decree of dissolution, the plaintiff sold 2,000 shares of the Neurogen stock in the child Alexander's UGMA account, which rendered $29,746.00. The plaintiff utilized $18,655.04 of the $29,746.00 CT Page 12784-F UGMA funds to pay off his own personal debt to Smith Barney. He also deposited $8,000.00 of those funds into his personal Smith Barney account. He intends to use these funds, in part, to pay his father's funeral expenses. In October, 1995, the plaintiff sold 890 shares in Alexander's UGMA account, which rendered approximately $18,000.00. The $18,000.00 in proceeds from the October sale have not been expended and remain in an unnegotiated draft in plaintiff's possession.
Plaintiff argues that these UGMA accounts are not an undisclosed asset, but are his sons' assets. He now argues that the funds at issue were utilized to reimburse him for expenses he had incurred on behalf of Alexander, and that he made the decision to so utilize them sometime in June, 1995, after the trial. The plaintiff is not credible.
The Smith Barney debt of his that totalled $18,655.04 was variously, throughout his initial testimony, for his personal attorney's fees, his bad stock purchases, and Alexander's college and related expenses — an obligation he asserted personal responsibility for as part of his prayer for relief, sworn testimony and sworn financial affidavit at trial. A large portion of the assets of Alexander's UGMA account was utilized by the plaintiff as if it were his own funds. It was utilized interchangeably by him, for tax advantage, to pay his personal CT Page 12784-G debt that he could only satisfy by sale of stock. These were debts he agreed to personally pay as part of his prayer for relief.
The sworn statements of the unconditional transfer of the stock to the children were statements of fact that are untrue. The statement to the trial judge that the plaintiff wanted the 26,200 shares of Neurogen stock to be available for him to sell sufficiently to pay debt is untrue. The plaintiff misled the trial judge and defendant's counsel into believing he would pay his own debt and his children's expenses. The pretrial disclosure statements and the financial affidavit of plaintiff not showing these UGMA stocks induced the defendant's counsel to rely thereon in the presentation of her cause and claims for relief regarding assignment of assets and liabilities. It presented an inaccurate picture to the trial judge of assets available for distribution and in satisfaction of liabilities and ongoing obligations. The $29,746.00 proceeds are not insignificant and, had they or their stock source been available to the court, a different distribution of assets and liabilities, in all likelihood, would have resulted. The sum is greater than the plaintiff's total liability. It represents about 4% of the plaintiff's disclosed asset structure for the marriage, and about 13% of the total non-retirement disclosed asset structure of the marriage. Defendant has brought this claim in a timely manner; there are CT Page 12784-H no laches.
 "A court is entitled to rely upon the truth and accuracy of the sworn statements required by § 463 of the Practice Book, and a misrepresentation of assets and income is a serious and intolerable dereliction on the part of the affiant which goes to the very heart of the judicial proceeding. Casanova v. Casanova, 166 Conn. 304, 305, 348 A.2d 668 (1974)." Grayson v. Grayson, 4 Conn. App. 275, 288 (1985).
 "A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." Gelinas
v. Gelinas, 10 Conn. App. 167, 173 (1987).
The defendant had the right to rely on the disclosure and production assertion of a gift of stock, and, that the plaintiff intended to use his stock to satisfy his debt. Jucker v. Jucker,190 Conn. 674, 461 A.2d 1384 (1983); Trapp v. Trapp, 6 Conn. App. 143,503 A.2d 1187 (1986). Plaintiff never corrected these representations. By plaintiff's decision in June to utilize the UGMA stock the court concludes that plaintiff knew he could use that stock for his debt. So knowing, he had misrepresented the CT Page 12784-I stock as a gift in his disclosure and production. It was an asset he retained control over for utilization for his own purposes.
The court finds by clear and convincing evidence that the plaintiff fraudulently misled the defendant in his failure to disclose his equitable and proprietary rights to control, use and ownership of the shares of stock in Alexander's UGMA account in his disclosure and production answer, his financial affidavit and his testimony. There is a substantial likelihood that the outcome of trial would have been different had the UGMA assets been disclosed.
The Court declines to reach the balance of the defendant's claims inasmuch as this claim has been proven.
The Motion to Reopen Judgment is granted.
Motion #116 is denied without prejudice to the right of the defendant to raise the same issues again. Neither party presented evidence pertinent to this motion, having both directed all efforts to Motion #115.
Munro, J.